Doris L. DAUBERT, Plaintiff-Appellant,

v.

UNITED STATES POSTAL SERVICE,
et al., Defendants-Appellees.

No. 82–1917.

United States Court of Appeals,
Tenth Circuit.

April 13, 1984.

Douglas Pooley, Denver, Colo., for plaintiff-appellant.

Robert N. Miller, U.S. Atty., John R. Barksdale, Asst. U.S. Atty., Denver, Colo., John Arbuckle, United States Postal Service, San Bruno, Cal., Stephen Alpern, As-

sociate Gen. Counsel, Lynn Poole, United States Postal Service, Washington, D.C., for defendants-appellees.

Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.

### ORDER AND JUDGMENT

Doris L. Daubert (Daubert) appeals from an adverse order and judgment in an employment discrimination action she brought against the United States Postal Service (USPS). Daubert filed the action under 42 U.S.C.A. §§ 2000e *et seq.*, as amended, 29 U.S.C.A. §§ 621 *et seq.*, and 29 U.S.C.A. §§ 701 *et seq.*, as amended, alleging that she was illegally discharged by USPS on the basis of sex, age, and handicap.

During the latter part of 1976 and 1977, USPS advertised for and hired personnel to fill the job of multiposition letter sorting machine operator (distribution clerk-machine trainee). The job entailed a variety of functions including operating a mail-sorting machine, moving large quantities of mail to and from the machine, moving mail in and out of the area of the machine, and manually sorting mail. The vacancy announcement for this position stated that upon completion of training the trainee would be either placed in a position as a Part-time Flexible Distribution Clerk (PTF) and designated as "machine-qualified," or converted to full-time, regular status with USPS. The job announcement also stated that "any physical condition which would cause the applicant to be a hazard to himself or others will be cause for disqualification."

In 1977, Daubert, then forty-nine (49) years of age, applied for a distribution clerk-machine trainee position. After successfully completing a written examination, Daubert was administered a preemployment physical exam by Dr. Everett Irwin, a Post Office medical officer in Denver, Colorado. As part of the physical, Daubert was required to lift and carry mail sacks weighing up to seventy pounds for a distance of

thirty feet. According to Dr. Irwin, Daubert passed this test successfully [1] and without difficulty. During the physical, Daubert also told a nurse that she had suffered a cervical injury in 1965 but that she had not gone to a doctor for years and her back was fine. Thereafter, Daubert, in completing a medical history form, indicated "1965 whiplash—no aftereffects." [R., Pl.Ex. 2].

Daubert began working for the USPS on June 25, 1977, and successfully completed a ninety-day probationary period during which she performed a variety of jobs at the Denver Terminal Annex. After completing her probationary period, Daubert was classified as "PTF machine qualified." As a PTF, Daubert was not guaranteed forty hours of work each week, nor was she allowed to bid a specific job or have a regular work schedule. Instead, PTF's were required to work at "any" position including dumping mail sacks and unloading trucks as necessary.

At about this time, the USPS implemented "caddy pools." The caddy pools evolved after a study determined that greater efficiencies could be achieved by reducing the crew size on the sorting machine and utilizing the extra employees to transport mail on dollies to and from the machines. A fully-loaded dolly could weigh approximately 700 pounds. Daubert was assigned to a caddy pool consisting of eight men and four women, all of whom were PTF's.

On September 27, 1977, the first day Daubert attempted to handle a dolly on her own, she became ill after an hour's work and went home. The next day Daubert told her foreman that she could not perform the caddying work because of back injuries arising from an automobile accident in 1965. Thereafter, Daubert was assigned to light duty work. At the same time, Daubert went to her personal physician, Dr. Major, for a complete physical examination. As a result of his examination, Dr. Major recommended that Daubert refrain from heavy lifting or pushing.

---

**1.** All job applicants were required to take and pass a similar test since, as clerks, they may be

required to work anywhere in the post office when not working on a letter-sorting machine.

USPS subsequently requested that Daubert undergo a fitness-for-duty-examination from Dr. Irwin. Dr. Irwin examined Daubert on October 13, 1977, and reported to USPS that based on his examination and Dr. Major's report, Daubert was not fit for caddying or mailhandler-type work due to degenerative spine disease. In a later report to USPS, Dr. Irwin stated that Daubert's degenerative spinal condition was permanent and would become worse with time, and that he would not have approved her for employment had he been aware of her back problems at the time of her preemployment physical exam.

After reviewing the reports of Drs. Major and Irwin, USPS transferred Daubert to temporary light duty work rewrapping parcels in the "nixie" unit. On November 18, 1977, Daubert filed a grievance with her union alleging, *inter alia,* that she had been discriminatorily assigned to caddying work and that she had been denied upward mobility because of her degenerative spinal condition. On November 22, 1977, Daubert filed a request with the EEOC for counseling and a complaint against USPS in which she alleged that she had been discriminated against because of her age and sex.

Daubert was discharged on January 10, 1978. The notice of discharge stated that she was being discharged because of her inability to perform the duties of her position. Daubert's grievance with the union proceeded to arbitration, after which the arbitrator found that USPS had "just cause" for terminating Daubert. During Daubert's employment with USPS, the national collective bargaining agreement in effect prohibited USPS from permanently reassigning an employee in Daubert's position to light duty unless the employee seeking reassignment had a minimum of five years postal service.

On July 30, 1979, Daubert received the EEOC's final decision and notice of her right to sue. Daubert filed her complaint herein on August 29, 1979, alleging that she was illegally discharged by the USPS on the basis of her sex and age. Daubert also alleged, for the first time, that she was illegally discharged because of her handicap.

Within its order dismissing Daubert's complaint, the district court found: (1) to establish age or sex discrimination one must show he or she is in fact qualified for the position sought; (2) Daubert was not physically qualified to be a distribution clerk-machine operator, and, accordingly, she had failed to establish a *prima facie* case of age or sex discrimination; (3) Daubert established a *prima facie* case of handicap discrimination; (4) USPS articulated a legitimate business reason for Daubert's dismissal, i.e., it was legally incapable under its national union contract to modify the job requirements of a distribution clerk-machine operator or create an exception for Daubert's back problem; and (5) after USPS established legitimate business reasons for Daubert's termination, Daubert failed to show that the proffered reasons were merely pretextual.

On appeal, Daubert contends the district court erred in (1) allowing USPS to rely on the collective bargaining agreement as a legitimate business reason for her dismissal, (2) finding that she had failed to establish a *prima facie* case of age and sex discrimination, (3) failing to consider her allegation that her discharge was motivated, at least in part, by her filing a complaint with the EEOC, and (4) the findings of fact and conclusions of law made by the district court are clearly erroneous.

I.

■ Daubert contends the district court erred in allowing USPS to rely on the union collective bargaining agreement as a legitimate business reason and valid defense to her *prima facie* case of handicap discrimination. In considering Daubert's handicap discrimination claim, the district court proceeded in accordance with *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372 (10th Cir.1981). In *Pushkin,* we set forth the following guidelines for proceeding in a § 794 action:

Once plaintiff establishes his prima facie case, defendants have the burden of

going forward and proving that plaintiff was not an *otherwise qualified handicapped person,* that is one who is able to meet all of the program's requirements in spite of his handicap, *or that his rejection from the program was for reasons other than his handicap....*

*Id.* at 1387 (emphasis added).

In finding that USPS articulated a legitimate business reason for Daubert's dismissal (and that the dismissal was for reasons other than the handicap) the district court found:

> When the Service learned that she was physically incapable of performing the job for which she had applied—machine distribution clerk—it was left three alternatives: (1) permit her to perform only part of her job, (2) transfer her to a job requiring only light duty work, or (3) dismiss her. The union contract effective at the time prohibited the first option. E.C. Nix, Manager of Distribution in the Denver Post Office, testified that the union agreement's seniority requirements would have been violated if she had been assigned to machine duty only. Therefore that option was foreclosed.
>
> The Postal Service might then have transferred her permanently to a light-duty unit, such as that to which she was assigned briefly after discovery of her back problem. Union contract provisions barred this alternative, also, for such a permanent light duty assignment could only be held by persons with five-years' seniority or more. Daubert had been on the job for only 92 days.

R.Vol. I at pp. 76–77.

We hold that the district court properly found that USPS could rely on the collective bargaining agreement in discharging Daubert. USPS's contractual obligations to its employees and their union under the collective bargaining agreement clearly articulates a legitimate business reason for Daubert's discharge. Nothing in the record before us or in Daubert's arguments on appeal indicates that USPS's grounds for terminating Daubert, including reliance on the collective bargaining agreement was pretextual.

■ We further hold that, in any event, Daubert was not an "otherwise qualified handicapped person" under Section 504 of the Rehabilitation Act, 29 U.S.C.A. § 794. The Rehabilitation Act was enacted, as Daubert states, to promote and expand employment opportunities in the public and private sectors for handicapped individuals. Section 501(b) of the Act, 29 U.S.C.A. § 791(b), provides in part:

> Each department, agency, and instrumentality (including the United States Postal Service and the Postal Rate Commission) in the executive branch shall ... submit to the Civil Service Commission and to the [Interagency Committee on Handicapped Employees] an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals in such department, agency, or instrumentality. Such plan shall include a description of the extent to which and methods whereby the special needs of handicapped employees are being met
> ....

Section 504 of the Act, provides in part:

> No *otherwise qualified handicapped individual* in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service ....
> (Emphasis supplied)

A qualified handicapped person is defined in 29 C.F.R. § 1613.702(f) to be:

> With respect to employment, a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others and who, depending upon the type of appointing authority being used: (1) Meets the experience and/or education require-

ments (which may include passing a written test) of the position in question, or (2) meets the criteria for appointment under one of the special appointing authorities for handicapped persons.

29 C.F.R. § 1613.703 provides that the federal government shall give "full consideration to the hiring, placement and advancement of qualified ... handicapped persons" and shall "become a model employer of handicapped individuals." 29 C.F.R. § 1613.704 provides that agencies "shall make reasonable accommodation to the known physical ... limitations of a qualified handicapped applicant" including, but not limited to:

> (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

The seminal case interpreting the term "otherwise qualified handicapped individual" and delineating an employer's responsibilities under the Rehabilitation Act is *Southwestern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). In that case, Davis, who suffered from a serious hearing disability, sought admission into Southwestern's nursing program. After Southwestern rejected Davis' application, she sued under Section 504 alleging that she was an "otherwise qualified handicapped individual" and that her application was rejected "solely by reason of her handicap." The Supreme Court held that Section 504 was not violated and that nothing in the Rehabilitation Act prohibited an educational institution from requiring reasonable physical qualifications for admission to a clinical training program. The Court stated:

> As previously noted, this is the first case in which this Court has been called upon to interpret § 504.... Section 504 by its terms does not compel educational institutions to disregard the disabilities of handicapped individuals or to make

substantial modifications in their programs to allow disabled persons to participate. Instead, it requires only that an "otherwise qualified handicapped individual" not be excluded from participation in a federally funded program "solely by reason of his handicap," indicating only that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context.

> The court below, however, believed that the "otherwise qualified" persons protected by § 504 include those who would be able to meet the requirements of a particular program in every respect except as to limitations imposed by their handicap. See 574 F.2d [1158] at 1160 [4th Cir.1978]. Taken literally, this holding would prevent an institution from taking into account any limitation resulting from the handicap, however disabling. It assumes, in effect, that a person need not meet legitimate physical requirements in order to be "otherwise qualified." We think the understanding of the District Court is closer to the plain meaning of the statutory language. An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.

*Id.* at 405–06, 99 S.Ct. at 2367.

In *Davis* the Court rejected the Department of Health, Education and Welfare's suggestion that the word "otherwise" should be omitted in considering qualified handicapped individuals under Section 504, noting that "under such a liberal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be 'otherwise qualified' for the job of driving." *Id.* at 407 n. 7, 99 S.Ct. at 2367 n. 7. *Davis* has been repeatedly relied upon and cited for the proposition that a viable cause of action exists under Section 504 only if an individual shows that he is *otherwise* qualified for the position sought and that even though he was *otherwise* qualified, he was rejected for the position solely on the basis of his handicap. *See, e.g., Pushkin v. Regents of University*

*of Colorado, supra; Treadwell v. Alexander,* 707 F.2d 473 (11th Cir.1983); *Cook v. United States Department of Labor,* 688 F.2d 669 (9th Cir.1982) cert. denied —— U.S. ——, 104 S.Ct. 112, 78 L.Ed.2d 113; *Doe v. New York University,* 666 F.2d 761 (2d Cir.1981); *Prewitt v. United States Postal Service,* 662 F.2d 292 (5th Cir.1981).

Applying these decisions to the case at bar, we hold that the district court properly found that Daubert had failed to establish discrimination on the basis of handicap, inasmuch as Daubert was not "otherwise qualified" for the position of distribution clerk-machine trainee. As set forth *supra,* a distribution clerk-machine trainee was required to operate a mail-sorting machine, move large quantities of mail to and from the machine, and to manually sort mail. Also, as a PTF machine qualified, Daubert was not guaranteed forty hours of work a week, nor was she allowed to bid a specific job or have a regular work schedule. PTF's were also required to work at any position.

Daubert simply was not "otherwise qualified" for the job she sought. Although Daubert repeatedly asserted that she was qualified for the job, with the exception of the dolly work, the record indicates otherwise. Union representative Martin testified that Daubert had told him she was "in agony" at times while performing manual distribution and that she could not work distribution for long periods of time. Daubert's supervisor, John Schultz, testified that Daubert complained that throwing mail for over an hour and a half would hurt her back. We agree with the district court's finding that Daubert's termination by USPS was not motivated by any discriminatory intent on the basis of handicap, and that USPS "was merely attempting to comply with the union contract and assure no further physical injury to Daubert." (R.Vol. I at p. 78).

## II.

■ Daubert contends that the district court erred as a matter of law in concluding that she had failed to establish a *prima facie* case of age and sex discrimination. Daubert further contends that the district court also misinterpreted the duties and job requirements of the job for which she was hired, as opposed to other jobs.

In finding that Daubert had failed to establish a *prima facie* case of age or sex discrimination the district court observed that to recover for age or sex discrimination a plaintiff must show that she was in fact qualified for the job.[2] A requirement of the job in question was the ability to carry seventy pound sacks of mail approximately thirty feet; Daubert, because of her back injuries, could not perform that task and both Daubert's personal doctor and Dr. Irwin of USPS recommended that Daubert not lift heavy weights. Daubert's physical limitations prevented her from being qualified for the job.

Our review of the record convinces us that the district court did not misinterpret the duties and job requirements of the job Daubert sought. On the contrary, it appears that Daubert, after being hired by USPS, tried, albeit unsuccessfully, to have USPS tailor the specifications of the job so as to be compatible with her personal desires and limitations. In so doing, Daubert applied for and accepted a job without disclosing the seriousness of her back injuries and the substantial limitations caused thereby. The importance of this failure to disclose is amplified when, as here, the job notice specifically stated that "any physical condition which would cause the applicant to be a hazard to himself or others will be a cause for disqualification."

## III.

We have carefully considered Daubert's numerous other allegations of error and hold them to be individually and collectively without merit.

The judgment is affirmed.

---

**2.** Citing to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Schwager v. Sun Oil Co. of Pennsylvania,* 591 F.2d 58 (10th Cir.1979).